[Civil No. 2038.   Filed July 21, 1923.]

[218 Pac. 152.]

# SOUTHWEST COTTON COMPANY, a Corporation, Appellant, v. W. J. POPE, Appellee.

1. TRIAL—DEFENDANT HELD TO HAVE WAIVED RULING ON MOTION FOR DIRECTED VERDICT BY INTRODUCING EVIDENCE IN SUPPORT OF DEFENSE.—Defendant waives error in ruling on motion for a directed verdict at the close of plaintiff's case by introducing evidence in support of its defense.

2. TRIAL—RULE FOR PASSING UPON MOTION FOR INSTRUCTED VERDICT STATED.—The effect of a motion for instructed verdict at close of whole case is to admit the truth of all competent and relevant evidence introduced tending to sustain plaintiff's cause of action, whether offered by plaintiff or defendant, and if the evidence appraised by the court at its highest value in plaintiff's favor, as it should be, establishes a right of recovery in plaintiff it is the duty of the court to deny the motion.

3. NEGLIGENCE — EVIDENCE OF NEGLIGENCE IN PERMITTING STRIPS OF FLOORING TO BECOME INSECURE HELD INSUFFICIENT TO GO TO JURY.—In an action for injuries to plaintiff's foot caught in a cottonseed conveyor, proof to sustain allegations of negligence in permitting strips of flooring covering the conveyor trough to become worn, loosened and weakened, *held* insufficient to go to jury.

4. NEGLIGENCE—RECOVERY MUST BE UPON PROOF OF ACTS ALLEGED.— In negligence cases plaintiff must recover upon proof of acts set out in his complaint as constituting his cause of action.

5. NEGLIGENCE—OWNER'S LIABILITY COEXTENSIVE WITH INVITATION.— An owner's liability for the condition of his premises is only coextensive with his invitation, and it is incumbent upon one injured thereon to show not only that his entry upon the premises was by the owner's invitation, but also that at the time of the injury he was in that part of the premises into which he was invited to enter, and was using them in a manner authorized by the invitation, whether express or implied.

6. NEGLIGENCE—SALESMEN HELD TO HAVE EXCEEDED INVITATION.— Plaintiff oil salesman, having a right to solicit defendant's trade

6. Whether one who goes upon property on business with owner is deprived of the right to protection against defects by temporarily turning aside to pursue a purpose of his own, see notes in 17 **Ann. Cas.** 591; 14 **L. R. A. (N. S.)** 1118.

Duty and liability of owner to one on premises for purposes of seeing his employees, see note in 24 **L. R. A. (N. S.)** 497.

See 29 Cyc. 449, 452, 457, 583, 627; 38 Cyc. 1565, 1567, 1590.

and to inquire concerning empty containers, *held* to have exceeded his invitation when he left defendant's office and began to search for defendant's foreman in defendant's cotton-gin and seedhouse, so that he was entitled to no more care than an ordinary licensee, and could not recover for injuries to his foot caught in a seed conveyor covered by insecure strips of flooring.

7. NEGLIGENCE—DUTY TO LICENSEE STATED.—An owner of premises owes to a licensee no duty as to the condition of the premises unless imposed by statute, save that he should not knowingly let him run upon a hidden peril, or wantonly or willfully cause him harm.

APPEAL from a judgment of the Superior Court of the County of Maricopa. Joseph S. Jenckes, Judge. Judgment reversed and cause remanded, with directions to dismiss complaint.

Mr. G. P. Nevitt, Mr. J. B. Ogg, and Mr. Samuel White, for Appellant.

Messrs. Kibbey, Bennett, Gust & Smith and Mr. J. E. Noble, for Appellee.

ROSS, J.—While on defendant's premises at Tolleson, Maricopa county, plaintiff came in contact with a piece of machinery being used and operated by defendant and was injured. He sued the defendant charging negligence in the respects hereinafter stated. The defendant answered by a general denial, contributory negligence and assumed risk. A trial before a jury was had which resulted in a verdict and judgment in favor of the plaintiff. Defendant appeals.

The defendant at the time was extensively engaged in the growing of long staple Pima cotton in the Salt River Valley, and, for the purpose of separating the seed from the lint, had constructed at different places throughout the valley some sixteen plants or cotton-gins, one of which was at Tolleson. The seedhouse where the accident occurred was used in conjunction with the defendant's gin. It was

thirty-four feet by twenty feet, running north and
south the long way; the walls were fourteen feet
high; there were small windows on the south, east
and north sides.

The cottonseed, as they were separated from the
cotton, were deposited in an electrically driven seed
auger or conveyor, extending from the floor of the
gin to and above the ceiling rafters in the seedhouse,
and in its revolutions the seed were carried from the
gin to the seedhouse and deposited there. Under the
ground floor, at the center of the seedhouse and ex-
tending its entire length north and south, is another·
electrically driven seed auger or conveyor which car-
ries the seed into railroad cars spotted on the track
near the south wall of the building. This conveyor
occupied the space between two floor joists about
fourteen inches apart, and was covered by removable
strips about eighteen inches long by fourteen inches
wide fastened on wooden cleats and fitted so snugly,
as the complaint alleges, that they—

"were identical in appearance with the remainder of
said flooring and were smooth and even, on a level
with the remainder of the floor in said building; that
when said strips of flooring were in place covering
said conveyor it was impossible for one unacquainted
with the operation of said seedhouse to know that
said conveyor was being operated beneath said floor-
ing."

The conveyor would choke if too many seed got
into it, so it was necessary that someone feed it. To
do this, one or two of the strips would be removed
and the seed shoveled into the opening, the rest of the
conveyor being kept covered with strips. The cotton-
seed were banked up around the east, north, and
west walls, but the floor in the center of the building,
extending from the south wall along the trough of
the conveyor and for some distance on each side
thereof, was kept fairly free of seed, so that the

person feeding the conveyor could see that part of the flooring covering same and get about easier thereon in performing his duties than if it were covered with cottonseed. The entrance into the building was on the south side and east of the conveyor.

November 17, 1920, the defendant was engaged in loading from said seedhouse into a freight-car a load of seed by means of the conveyor underneath the floor of the seedhouse. T. L. Tucker, the foreman for the defendant at its Tolleson gin, was in the seedhouse attending to the feeding of the auger or conveyor. In the middle of the afternoon of that day the plaintiff, as he alleged in his complaint, being "engaged in the occupation of selling gasoline and lubricating oils, and at the invitation of defendant went into said seedhouse for the purpose of interviewing the gin foreman, a man by the name of Tucker, who was then and there in said seedhouse." Plaintiff first went to the defendant's general office, announced his business as salesman of the Union Oil Company and engaged in looking up some empty barrels, and was told by the two young men in the office that they knew nothing about barrels, and to see the foreman, Mr. Tucker, who was somewhere out about the gin. On his way from the office to the gin plaintiff found two Union Oil barrels in the yard and checked them. Proceeding to the gin he asked two other employees of defendant for Tucker, and was told he was somewhere about the seedhouse where seed were being loaded. He then approached a car on the south side of the building, and one of the two men working therein, in response to his inquiry, told him Tucker was inside the seedhouse. As plaintiff explained, he entered the building at the south door and advanced to where Tucker was feeding conveyor. Tucker's back was to him and he did not know of plaintiff's presence until spoken to. He in-

quired about some containers, and was told that one was empty or about so, but that there was considerable oil in the other. He then asked Tucker how his purchases were made, and was told by Tucker that when he was in need of oils he took it up with the general superintendent of gins, who in turn took it up with Mr. Feeley, the general purchasing agent, who placed the requisition for the commodity wherever he chose. During this conversation they were standing near the trough of the conveyor, and closer to the north wall of the building than to the south wall. Tucker during the time, as he says, was feeding the conveyor through an opening the size of one of the strips which had been removed. The rest of the conveyor was covered by strips.

The plaintiff testified:

"After I had completed my business with him, I bid him good-bye and started straight out the south door. I had only gone two or three steps when the accident occurred. The first thing I knew my foot was in the seed auger. The first thing I did was holler, 'Shut her down!' when I realized my predicament, and one of the boards was digging into my ankle here (indicating). When I hollered, Mr. Tucker ran out of the south door, and it was just a very short time until the power was turned off the auger, a very few seconds."

He also testified he did not know there was an auger under the floor; that the light was not very good; that, so far as he knew, the boards covering the auger were down over it; that he saw no difference in the floor; that he did not see any machinery prior to the accident; that there was nothing in the seedhouse to indicate it as anything but a storage-room; that the only noise he heard was "something that sounded as though hail was beating on a tin roof." The plaintiff had never been in the seedhouse before.

Mr. Tucker, the only other witness who was present when the accident happened, agreed with plaintiff's statement in that he did not know until spoken to that plaintiff was in the building, and also as to the substance of the conversation. He testified that after plaintiff had turned to go he resumed the work of feeding conveyor, and that almost instantly he heard plaintiff yell, and looked and saw that his foot was caught in the auger; that he did not know how it happened or how it occurred; that it was a mystery how he got in there. He said the light was good. This witness testified that "as far as he knew the conveyor and the machinery and the methods used in conveying seed from seedhouse is the usual and customary method used here in the valley." He further said that he considered the auger was safely constructed.

The specific acts of negligence charged against defendant are:

"That on the 17th of November, and for some time prior thereto, defendant had negligently and carelessly allowed and permitted one or more of the strips of flooring hereinbefore described covering said conveyor to become worn, loosened, and weakened, and the joists and planks forming the trough of said conveyor and supporting said strips of flooring to become worn, loosened, and weakened; that by reason thereof the floor in said seedhouse, and particularly that portion of the flooring covering said conveyor, had become dangerous and insecure, and a wholly unsafe place for any person to walk. . . . That while plaintiff was in said seedhouse, as aforesaid, and in the exercise of reasonable care and caution for his own safety, one of the strips of flooring which defendant had negligently and carelessly allowed to become loosened, weakened, and insecure, as aforesaid, gave way beneath plaintiff, and plaintiff was immediately precipitated down into and upon said iron, screw, auger, worm, or conveyor, which was then and there revolving at a high rate of speed. . . ."

25 Ariz.—24

The defendant's principal grievance against the action of the trial court is the refusal to grant its motion for a directed verdict at the close of plaintiff's case and again at the close of the whole case, first, because, as it asserts, of a failure of proof to sustain his allegations of negligence; and, second, because the testimony shows that plaintiff was not an invitee but a mere licensee at the time of his injury, and that even though the business of the plaintiff might have been for the mutual and common benefit of both plaintiff and defendant, entitling the plaintiff to admission to defendant's general office to solicit business and to inquire for barrels and empty containers, it did not authorize him to go into the defendant's seedhouse, and that in doing so he was a mere licensee.

The only ruling upon the motion for a directed verdict properly before us is the one at the close of the whole case, since the defendant waived the one made at the close of plaintiff's case by proceeding to introduce evidence in support of its defense. *Southwest Cotton Co.* v. *Ryan,* 22 Ariz. 520, 199 Pac. 124; *Hines* v. *Gale, ante,* p. 65, 213 Pac. 395.

The charge of negligence in the complaint is not one of defective construction of the conveyor or the covering thereof, but in allowing and permitting one or more of the strips of flooring covering the conveyor to become worn, loosened and weakened, and the joists and planks forming the trough of conveyor and supporting the strips of flooring to become worn, loosened and weakened so that one of the strips gave way beneath plaintiff, immediately precipitating him down into and upon the conveyor.

There was absolutely no testimony worthy of the name to the effect that the strips used to cover the conveyor trough had become worn, loosened or weakened. One of the witnesses testified the strips did

not fit as tight as could be, but there was not much play. Another, that they appeared to have some play. Another said:

"The boards would get changed from place to place. The boards are not sawed straight and would leave gaps probably on one of the sides so it would not get as good hold on the jamb as it should get. In such case there would be play."

Witness Cummings testified:

"The boards covering auger were on a level with the rest of the floor. The boards fit pretty good."

He further testified, over objection of defendant, that some time before November 17, 1920, he was feeding the conveyor and as he ran across the boards "one of the boards came off and I happened to fall in the seed auger." When asked what happened to the board he said: "It just slipped. It happened several times." On cross-examination he said his foot slipped and hit the board and it went down; that it never happened when he was standing still or walking but when he was running, skipping or jumping.

This was the sum total of the testimony in support of the allegations of negligence in plaintiff's complaint when he closed his case, and we do not think it was strengthened by the testimony of defendant's witnesses. The only one of defendant's witnesses questioned thereon was Tucker, and he said:

"They (the boards) were not very much worn; there was nothing very much to wear them. No, sir; I would say that they had not become worn. They were smoother; the action of the seed would tend to smooth."

This witness also said: "The side boards showed some indication of wear from the seed," and that the top of the strips or crosspieces showed some indication of wear; that "the floor of a seedhouse is slip-

pery to a certain extent. Anything that seed comes in contact with gets slippery.''

The boards or strips covering the conveyor were put in during the summer of 1920, and must have been practically new at the time of the accident. From the evidence it appears that these strips were made of a length, so that by lifting one an aperture would be left through which the conveyor could be fed; that they were all about the same size and that one of them could be lifted from its place with the same ease as another; that necessarily there had to be a little play between the floor and the edges of these strips in order that they might be taken up and replaced without difficulty; that if there was any play or looseness in the strips it was in the original construction; that the only wear on the surface of the strips was that occasioned by the contact with the cottonseed which had a tendency to smooth the surface of the boards. There is nothing in the evidence to show that the boards had been weakened, or that they had been loosened in the least by the attrition of the cottonseed. The testimony of Cummings that at other times before November 17th these strips had slipped with him does not support the allegation that they had become worn, loosened, weakened or insecure, but rather that they may have been faulty in construction or had become 'smooth and slippery from contact with the oily cottonseed, and were likely to be jarred out of place if one slipped against them, or when one was running, jumping or skipping on or over them. If they were loose, or weak or insecure, it must have been in the original construction, and the only evidence of any wear was that the surface had become smoother by coming in contact with the cottonseed.

In *Hines* v. *Gale, supra,* we laid down the rule which should guide the trial court in passing upon

a motion for an instructed verdict. That rule reads as follows:

"In considering the motion for instructed verdict at the close of the whole case, it was the duty of the court to appraise the evidence at its highest value in favor of the plaintiff. The effect of such motion was to admit the truth of all competent and relevant evidence introduced, tending to sustain plaintiff's cause of action, whether offered by plaintiff or defendant. If the evidence, when thus treated, established a right of recovery in plaintiff, it was the duty of the court to deny the motion."

Whatever may have been the cause of the accident, we think there was an entire failure upon the part of plaintiff to show that it was due to the strips becoming loose, weak, worn, or insecure. One thing seems sure: The unsafe condition of the floor was not due to any material change caused by use or otherwise since its construction. The strips had some play, but it does not appear that this play arose from use. There is no testimony that the boards had become weakened. It is not shown that the board covering the hole where plaintiff's foot was caught, was broken under his weight or why it gave way. Neither was there a scintilla of evidence offered by plaintiff tending to show that boards used to cover conveyor trough were worn. The defendant's witness Tucker stated that the boards indicated wear, but when this statement is viewed in the light of the rest of his testimony and that of plaintiff's witnesses, it simply means that the contact and friction of the cottonseed had given the boards a slippery and smoother surface than when first placed in the floor.

It is the rule in negligence cases that the plaintiff must recover, if at all, upon proof of the acts set out in his complaint as constituting his cause of action. This rule is stated in 20 Ruling Case Law, 176, section 146, as follows:

"But while the courts are liberal with respect to variances between the allegations and the proof in actions founded on negligence, yet it is a settled rule that the plaintiff must recover, if at all, upon proof establishing the specific acts of negligence alleged in his declaration, complaint or petition. Having pleaded specifically the act or acts constituting the defendant's negligence other acts of negligence cannot be relied upon, unless the declaration, complaint or petition is amended to conform to the proof."

As early as 1894, in *Santa Fe, Prescott & Phoenix Ry. Co.* v. *Hurley,* 4 Ariz. 258, 36 Pac. 216, Mr. Chief Justice BAKER, writing the opinion of the court, stated the rule as contained in Ruling Case Law, in the following language:

"The rule is very well settled that, if the plaintiff specifically plead the act or acts constituting the defendant's negligence, he cannot prove other and different act or acts for the purpose of substantiating his complaint."

And in *Phoenix Ry. Co.* v. *Beals,* 20 Ariz. 386, 181 Pac. 379, we said:

"In personal injury cases the plaintiff must prove the specific act of negligence assigned as the cause of her injury."

See, also, *McGinn* v. *United States Finishing Co.,* 27 R. I. 58, 60 Atl. 677; 29 Cyc. 587; *Greco* v. *Western States Portland Cement Co.,* 84 Kan. 110, Ann. Cas. 1912A, 638, 113 Pac. 410.

If the defendant had not, either expressly or by implication, invited the plaintiff to visit and solicit business in its seedhouse, then the plaintiff was at most a licensee, and as such took his chances. In other words, the defendant owed him no duty except not to actively do him harm.

It is in evidence that the defendant used a great deal of lubricating oils and grease at its various plants and enterprises throughout the Salt River Valley, most of which it had been getting from the

Standard Oil Company; but for some months prior
to plaintiff's accident defendant had been taking
small orders from the Union Oil Company for some
of its products. In September, 1920, the Union Oil
Company secured an agreement with defendant
known as "price agreement," covering fifty barrels
of lubricating oil. It was not an order, but an agree-
ment by the Oil Company to protect defendant
against any raise in price for one year, or until de-
fendant had purchased said fifty barrels. This agree-
ment having been obtained, the local representa-
tives of the Union Oil Company undertook, with the
approval and acquiescence of the defendant's pur-
chasing agent, a campaign to have the Union Oil
Company's products substituted, at its different
plants, for the Standard Oil Company's products.
The purchasing agent of defendant accordingly ad-
vised the Union Oil Company's representatives to
check up the defendant's plants, or units, and see
what they were using, and to get requisitions from
foremen for Union Oil Company's products, stating
that if the requisitions came through marked Zerolene
he would buy Zerolene; if they came through marked
Aristo he would buy Aristo, the former being a
Standard and the latter a Union product.

The purpose of plaintiff's visit was to locate empty
barrels and containers and to solicit trade, and he
claims that the above arrangement was an invitation
to him to visit the seedhouse. The witnesses for
defendant stated the foremen of the different gins
had nothing to say or do with the ordering of lubri-
cating oils; that the general superintendent of gins
did all that, and made all the requisitions for oil and
grease. The general purchasing agent denied telling
the employees of Union Oil Company to visit defend-
ant's gins and get its foremen to ask for Aristo. We
adopt, as we must, as correct the statement of the

arrangement as made by plaintiff and his witnesses, for the purpose of this question.

It is uncontradicted that defendant was satisfied with the Standard products, and that it did not change therefrom to Union products because the latter were better or more satisfactory. It seemed to be a rivalry between the two oil companies to get defendant's business. The defendant's agents were indifferent as to which product it used. As the general purchasing agent said, if the requisitions were for Zerolene he would buy Zerolene, or if for Aristo he would buy Aristo. In other words, the policy of buying some of the Union products was not adopted by the defendant's agents because they were better or more satisfactory, but for the purpose of apportioning its trade between these two gigantic rivals, leaving it somewhat to the industry and engaging persuasiveness of their agents as to which would get the greater patronage. Now, for the purpose of this contest of wits and industry, it cannot be supposed the defendant was offering the contending forces, as a battleground, the free and unrestrained access to all of its plants, including gins and seedhouses necessarily equipped with powerful machinery, electrically driven and more or less dangerous, especially as it was to get nothing out of it, except perhaps goodwill and friendship. If such a friendly attitude toward the Union Oil Company and its employees may be construed at all as an invitation to the latter to visit its premises and solicit trade, we think the invitation should be limited to the usual place where such business is transacted. Defendant had an office, or a room, or building, at Tolleson where we may suppose persons having business with it, or its foreman at that place, could visit and transact such business.

We will grant in this case that Pope's visit was for the mutual advantage or common interest of both

himself and the defendant, and that seems to be the principal *criteria* distinguishing a visitor from a licensee (*A. T. & S. F. Ry. Co.* v. *Cogswell,* 23 Okl. 181, 20 L. R. A. (N. S.) 837, 99 Pac. 923), still his visit should have been confined to that part of defendant's premises set apart for the transaction of such business. In *Stamford Oil Mill Co.* v. *Barnes,* 103 Tex. 409, Ann. Cas. 1913A, 111, 31 L. R. A. (N. S.) 1218, 128 S. W. 376, a case wherein a twelve year old boy's foot came in contact with a seed conveyor by his becoming, as he testified, "overbalanced," the court in passing upon an instruction that broadly defined the duty of defendant to exercise ordinary care, without proper qualifications, said:

"It is true that those who use premises for the purpose of transacting business thereon with the public thereby invite the public to come and deal with them and therefore owe to those accepting the invitation the duty of using ordinary care to make reasonably safe for their use the place or places assigned to such uses; but even this duty does not involve in its scope parts of the establishment to which the public is not invited. Hotel-keepers do not invite guests to their engine-rooms; nor do carriers invite passengers to the many places not fitted up for their use."

The seedhouse was not intended for anything other than a storage-room for cottonseed, to be, as occasion arose, transferred by means of said conveyor, to cars for shipment to other points. There certainly has not been proved any implied invitation to the Union Oil Company's employees to go therein unannounced, as plaintiff did, and there is an entire absence of evidence of an express invitation to such employees to visit the seedhouse, even though it be concluded the arrangement between the Union Oil Company and defendant amounted to an invitation to the former's servants to visit that place on defendant's premises at Tolleson set apart for the transaction of any busi-

ness growing out of or connected with the ginning of cotton and its by-products. It is not shown that the defendant, or any of the employees of defendant who informed plaintiff where Tucker was, directed or commanded the plaintiff to go to the seedhouse, or that they had any authority to do so, or that they had any charge or control of defendant's premises, or that it was a custom for salesmen, or those looking for empty containers, to go to the seedhouse of defendant to transact their business.

From the cases we think this rule, which we take almost word for word from *Ryerson* v. *Bathgate,* 67 N. J. L. 337, 57 L. R. A. 307, 51 Atl. 708, is deducible: That the owner's liability for the condition of his premises is only coextensive with his invitation, and it is incumbent upon a plaintiff to show not only that his entry upon the premises was by invitation of the owner, but also that at the time the injury was received he was in that part of the premises into which he was invited to enter, and was using them in a manner authorized by the invitation, whether express or implied. The following cases support this rule: *New York Lubricating Oil Co.* v. *Pusey,* 211 Fed. 622, 129 C. C. A. 88; *Glaser* v. *Rothschild,* 221 Mo. 180, 17 Ann. Cas. 576, 22 L. R. A. (N. S.) 1045, 120 S. W. 1; *Heinlein* v. *Boston & P. R. Co.,* 147 Mass. 136, 9 Am. St. Rep. 676, 16 N. E. 698; *Hutchinson* v. *Cleveland-Cliffs Iron Co.,* 141 Mich. 346, 104 N. W. 698; *Kennedy* v. *Chase,* 119 Cal. 637, 63 Am. St. Rep. 153, 52 Pac. 33. In the latter case it is said:

"The duty of the owner . . . has relation to the object for which the right of entry is extended, and is limited to responsibility for the condition of that portion of the premises required for the purposes of the visit. It does not impose liability for the want of safety at a point without those limits, and where the injured party was neither invited nor expected to go."

There was no testimony introduced to show the extent of the agency of the purchasing agent of the defendant, but we think it may be reasonably assumed that it extended no further than the words descriptive of his capacity import. It could hardly be assumed without proof that he was delegated the power by the defendant to invite salesmen of the Union Oil Company to visit the different cotton-gins and seedhouses of the defendant throughout the Salt River Valley, and go into and through these buildings in search of the different foremen in charge thereof, for the purpose of securing their requisitions for Union Oil Company's products, and thereby and in that manner charge the defendant with the duty of exercising the same care and caution toward such solicitors as the law imposes upon it toward persons lawfully upon its premises. *Alabama Ry. Co.* v. *Godfrey,* 156 Ala. 202, 130 Am. St. Rep. 76, 47 South. 185; *Norris* v. *Hugh Nawn Contracting Co.,* 206 Mass. 58, 19 Ann. Cas. 424, 31 L. R. A. (N. S.) 623, 91 N. E. 886.

We have come to the conclusion that the plaintiff, when he left the main office at Tolleson (where he no doubt had a right to go and solicit trade and inquire concerning empty containers) and began to search for Tucker, the foreman, in the gin and in the seedhouse, exceeded the limits of his invitation and was entitled to no more care than an ordinary licensee, which care is defined as follows:

"The rule is well settled that an owner of premises owes to a licensee no duty as to the condition of such premises, unless imposed by statute, save that he should not knowingly let him run upon a hidden peril, or wantonly or willfully cause him harm." 29 Cyc. 449.

We do not feel that the conclusion we have reached is in the least in conflict with the cases plain-

tiff cites to sustain his position. *Zeigler* v. *Oil Country Specialties Mfg. Co.,* 108 Kan. 589, 196 Pac. 603, involved the question as to whether one seeking employment of defendant manufacturing company was a mere licensee or an invitee at the time he fell into a trapdoor and was hurt. The court held he was an invitee, because at the time of the accident he was obeying the orders of the superintendent of defendant. The court said:

"When the plaintiff inquired of the defendant's superintendent concerning employment, the plaintiff was directed to see the foreman, and was in substance told where to go. That act of the superintendent took the plaintiff out of the class of persons known as licensees, if he were one before that time, and placed him within the class known as invitees."

The plaintiff in *St. Louis, I. M. & S. Ry. Co.* v. *Wirbel,* 104 Ark. 236, Ann. Cas. 1914C, 277, 149 S. W. 92, a locomotive fireman, went to defendant's yards in McGehee asking employment, and, while searching for the master mechanic, who, he had been told, was somewhere in the yard, was hurt. The court said:

"If the master mechanic had authority to employ a locomotive fireman and was accustomed to do so at his office or anywhere in the yards where he might be found, and his office man directed appellee to seek him in the yards, in so doing he still had the right to rely upon the invitation and the duty of the appellant to exercise ordinary care to protect him from injury. . . ."

The case, however, was reversed because there was no testimony showing that it was customary for the master mechanic, or that he had authority, to employ servants either at his office or in the defendant's yards. The same rule is announced in *McDonough* v. *James Reilly etc. Co.,* 45 Misc. Rep. 334, 90 N. Y. Supp. 358.

We are of the opinion that the plaintiff failed to make out the case as set forth in his complaint, and that the court erred in refusing to grant defendant's motions for an instructed verdict at the close of the case.

The judgment is reversed and the cause remanded, with the direction that the complaint be dismissed.

McALISTER, C. J., and LYMAN, J., concur.