Patricia Brett, Appellee, v. Century Petroleums, Inc., Appellant.

Gen. No. 40,641.

Opinion filed October 31, 1939.

ROBERTSON, CROWE & SPENCE, of Chicago, for appellant; BURT A. CROWE, of counsel.

WRIGHT & KAMIN, of Chicago, for appellee; ALFRED KAMIN, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

Upon trial of an action for damages for personal injuries sustained by plaintiff a jury returned a verdict finding Century Petroleums, Inc., a corporation, appellant, guilty and assessing plaintiff's damages at $600.

The complaint charges that defendants, Century Petroleums, Inc., a corporation, and Christ Chulos, possessed, operated and controlled a certain automobile service station at the corner of Western avenue and Peterson road, Chicago; that on January 5, 1935, plaintiff was a patron of defendants in said service station and was walking with all due care and caution for her own safety in and on said premises; that defendants then and there carelessly and negligently permitted a certain greasing pit to remain unmarked and unguarded without any signs or warning of danger,

and carelessly and negligently permitted certain parts of said premises to become and remain dark and unlighted so that they thereby became and remained dangerous to patrons; that as a direct and proximate result of the misconduct of defendants and while plaintiff was walking on the premises she was caused suddenly and without notice to her to fall into the pit, inflicting divers injuries upon her, for which she asks judgment. The defendants answered separately, and thereafter Chulos, the operator of the service station, was, on his own motion, dismissed from the cause. The answer of Century Petroleums, Inc., (hereinafter called defendant) denies the general allegations of the complaint and alleges that neither it nor its agents were guilty of the acts of negligence charged by plaintiff but that on the contrary the injury and damage to plaintiff, if any, was caused through her own fault and negligence.

Defendant contends that ''the plaintiff was guilty of contributory negligence as a matter of law. a. The plaintiff failed to prove that before and at the time of the accident she was in the exercise of due care and caution for her own safety. b. The court erred in overruling the motion of the defendant to withdraw the evidence from the jury and instruct the jury to find the defendant not guilty at the close of the plaintiff's evidence and again at the close of all the evidence. c. The court erred in refusing to grant defendant's motion for judgment *non obstante veredicto.''*

The accident happened in defendant's building, located at Western avenue and Peterson road, Chicago. Defendant operated a gas filling station, a building used for washing and greasing cars, and a second building, separate from the first one, that contained a repair shop. An office was located in the east end of the first building. Defendant's premises were located on the southwest corner of the intersection of the two streets. Plaintiff, a married woman, owned a Pontiac

car and on the evening in question drove it to the corner of Crawford avenue and Irving Park boulevard to meet a Mr. Frank, and at that point the latter got into plaintiff's car. "It was a rather dark, hazy night; streets had melted snow on them." At the intersection of Peterson road and Western avenue her car collided with another car, "just a slight bump." Plaintiff states that the left front wheel of her car was damaged. Frank testified that the "automobile steering-knuckle was bent." Frank went to defendant's gas station to get assistance. He came back with an automobile mechanic from the station, Joseph Grabow, who, after looking at the car, told Frank and plaintiff that he *"could fix the car up temporarily so that they could drive away."* Grabow said that he could not do the work on the car in the street and the car was driven to the gas station, either by Frank or Grabow, where it was stopped at "the third door of the west end of the building." Frank and Grabow agree that the automobile remained in that position until it was repaired. The repair work was finished shortly after the accident to plaintiff, and plaintiff and Frank then drove the car from defendant's premises. There were three garage doors, facing north, in the west end of the building, all of which were closed at the time. Grabow went into the shop, in "an extra building, not the garage building," and got some tools and started to work on the car. Frank remained at the car watching Grabow do the work. Plaintiff testified that when the car stopped outside the west end of the building she walked from her car east to the office of the filling station and entered therein for the purpose of going to the "ladies' room"; that at the time she entered the office her car was outside; that she had never been at the filling station before, and that "the whole set-up on the southwest corner covered by the gas filling station property and the buildings adjacent to it and on it were unfamiliar to me." She further testified that as she got out of the car the mechanic was walking toward a door

to her right and he stated that he would take charge of the car, but that she did not see what he did; that the office at the east end of the building was "an ordinary lighted office"; that Mr. Chulos (operator of the service station) was in the office when she entered it and she saw a negro attendant coming out of the washroom; that the size of the office was about twelve by fifteen feet; that she remained in the rest room for about three or four minutes and then reentered the office; that Chulos was the sole person there at that time; that the office door through which she had entered was then closed; that she then turned to the left and went through an open door that she had seen an attendant go through and which she thought would lead directly to her car; that this door was on the west wall of the office and was wide open; that if there had been a "No Admittance" sign over this door she would have seen it; that Chulos was facing toward the open door; that at the open door there was a small step leading down from the office to the "garage"; that after she went through the door she saw a car parked there. During her direct examination the following occurred: "Q. There was a car parked there. A. Yes. Q. Where was this car parked in reference to this door-way that you went through? A. You mean, the distance or the position of the car? Q. The position of the car. Just tell us where that car was. A. . . . The car was drawn up so that the wind-shield was about even with the door. Q. How far was this car from the wall as you walked along there? A. There was just a passage-way; I would say, two feet. Q. What was the condition of the inside of this repair place in reference to lighting conditions? A. The corner was black. Q. What was the general appearance there? A. There was a reflection from the light from the office through the door on this car, on the greasing pit. Q. Was there any light lit in the garage? A. No; not that I saw. Q. In so far as the garage doors were concerned, were there any windows in it? A. At the top, I think, there was a

reflection of the light through there. Q. Reflection of what light? A. The outside light. Q. What did you do then? A. I walked along the car. Q. How far did you walk along the car? A. From the distance of the wind-shield to the back of the car, the end of the car. Q. Then which way did you walk? A. I turned left. Q. And then which way—What did you do? A. My foot hit the rail or whatever it is, and I went into the grease pit. Q. Could you see this grease pit? A. No." Upon cross-examination plaintiff testified that her car was outside when she left it and that when she came out of the rest room she saw that the door through which she had entered the office, was closed. "Q. And the door, you say, that was at your left, that was wide open. A. Yes. Q. Did you know where you were going? A. I was going to my car. I supposed that had been driven in to be repaired. Q. You supposed it had been. A. Why, naturally. . . . Q. You had never been in that building or that garage before. A. No. Q. You walked through that door. That, you say, was open. A. I saw the attendant going through that door, and I went through the same door. . . . Q. The colored man. A. Yes. Q. When you went through that door, you were facing and walking towards the west, weren't you? A. Yes. Q. Was it dark in this garage? A. It was—I could see the reflection of the light on a car. The rest of it, I could see no light whatever. Q. As I understood you yesterday, you stated that outside of the light that was reflected on the automobile that was standing there, it was black, outside of that. A. I said the corner was black. Q. Which corner? A. The corner where I fell in the pit. Q. That would be the northeast corner of the garage. A. Yes. Q. That was black. A. That was black. Q. Did you pay any attention or notice whether or not there were any electric lights lighted in the garage proper as you walked through that door? A. I couldn't see any lights. Q. If there had been lights lighted,—obviously if there was one right in

front of you, you could have seen that. A. Certainly. Q. So, your idea of it now is, at least, there were no lighted electric lights in the garage. A. There were none that I saw; none. Q. And the only light that you had to guide you in going into that garage and seeking for your car, which you supposed was in there, was the light that shone from the office on to the side of an automobile that was standing near the office door. A. The automobile didn't obstruct my view of the rest of the garage. Q. I say, the only light there was was that reflected from the office on to that car. A. That's the light I saw. Q. Did you take any particular glance around the door as you went through it? A. I suppose, unconsciously I saw the door. Q. On the door there's an ordinary wide door frame, isn't there? A. I don't remember particularly diagnosing the door. Q. Did you look at the top of the door on the frame and see a white placard or piece of pasteboard— A. There was no— Q. I haven't finished. Do you know what I am going to ask you? A. Yes. Q. What am I going to ask you? A. If there was any 'No Admittance' sign. There was not. Q. You didn't see any 'No Admittance' sign there, did you? A. No, sir. Q. . . . How far away from the garage door was this car that you saw standing there? A. Not very much further than the width of my body. Q. How wide is your body? A. I would say, two feet, at least, with my coat on. Q. So, about two feet from the door leading into the office from the garage stood an automobile. A. Yes. Q. So that, when you stepped out of the door of the office, you were right close to and beside the automobile, obviously. A. Quite close, yes. Q. You then turned to your right, and as you turned to your right or to the north,— A. Yes. Q. —you were then facing that northeast corner. A. Yes. Q. And that location where you were facing and walking towards was pitch black and dark. A. The floor was pitch black, yes. Q. What about five feet above the floor? Was that light? A. The reflection of gray, I would say. Q. Could

you see where you were walking? A. I couldn't see the floor, no. Q. . . . You didn't know what was on the floor, of course. A. I thought it was just a concrete floor. Q. I am not asking what you thought. I say, you didn't know what was on the floor, did you? Not being able to see it, obviously, couldn't tell what was on it. A. It was concrete, yes. . . . Q. I know, but you couldn't see any objects on the floor. A. No objects. Q. It was that dark. A. Yes. Not at the door, back it was. Q. I am talking about looking towards this corner towards which you were walking. That was black, as you expressed it. You mean by that, it was dark and you were unable to see. A. Yes. Q. How many steps did you take towards the north, about? A. I would say, eight or ten, approximately. Q. . . . When you turned out of the door of the office and started towards the north, could you see the door of the garage? A. No. . . . Q. . . . The doorway that was open, through which you had just passed, did any light stream through there? A. It reflected on the car, yes. Q. Were there any windows in the wall of the garage or office— A. No. Q. —leading into the building or garage at all? A. No. Q. You are quite sure of that. A. There were no windows between the garage and office that I saw. Q. And you were taking very careful attention, weren't you? You were careful, I say, as you went along. A. Self-preservation; yes. Q. You knew you were in a strange place. A. Yes. Q. And you had to look out for yourself. You knew that, didn't you? A. Yes. . . . Q. Now, you took, you think about eight or ten steps to the north. A. I walked the length of the body of the car. I would say that would be about eight or ten feet. Q. And having walked that eight or ten steps, did you then see the door of the garage in front of you or the wall or anything? A. No. Q. Anyway, you got to the end of the automobile. A. Yes. Q. You were still then in a dark place. A. Yes. Q. And you turned to

the left. A. I did. Q. Why did you turn to the left. A. Because I expected that was where my car was. . . . Q. The car beside you, was that your car. A. No; but I thought the next one was. Q. When you got to the end of the automobile, were you looking ahead of you as you turned to the left to go west— A. No. Q. Around the end of the car? Were you looking ahead of you? A. No. I was looking to the side as I turned. Q. . . . Did you look at the floor? A. Yes. Q. What? A. I was looking where I was going. Q. Could you see anything? A. No. Q. Could you see the floor, even? A. No. Q. Could you see your feet below you? A. I didn't look at my feet. . . . Q. You couldn't distinguish any objects on that floor. A. No. Q. It was that dark. A. Yes. Q. You turned back of the car. How many steps did you then take? A. I took— No, my foot hit this—whatever it was—and in I went. Q. What was it? A. I never saw it.'' The witness further testified that she went outside after the accident and found her car was in the position where she had left it.

Henry Frank, plaintiff's witness, testified that he drove the car into the gas station grounds and in front of the west door; that Grabow opened the door to get some tools; that plaintiff asked to go to the washroom and she got out of the car and walked to the office; that he watched Grabow work on the car; that the latter opened the west door and brought out an acetylene gas drum to heat that part of the machine that had to be repaired; that after Grabow had been working on the car a few minutes he, Frank, heard a scream, and an attendant hollered that a lady had fallen down into the pit; that he followed three or four people into the place where plaintiff was; that when he went into the ''garage'' (the place where the grease pits were) it was very dark, but that lights were then flashed on and the garage was brilliantly illuminated, so that he could see, plainly and easily, the pit and ''all around me''; that

"there was a flange on the edge of the pit, six or seven inches high . . . from the floor level"; that over the pit into which plaintiff fell there was an automobile that had been "driven to the far south end of the pit"; that between the rear or north end of the automobile and north end of the pit "there was an exposure of about four feet"; that he did not know whether there was a sign, "No Admittance," above the door leading into the room where the grease pits were, as he "didn't pay any attention to warning signs." The undisputed evidence shows that there was but one car in the grease pit room at the time in question and that the employees who worked in the pits had ceased work for the day before the time of the accident; that each of the three pits was about twenty feet long, five feet wide and six feet deep. All of defendant's witnesses testified that above the door leading into the room where the grease pits were was a sign, "No Admittance."

". . . The question of contributory negligence is one which is preeminently a fact for the consideration of a jury. It can not be defined in exact terms and unless it can be said that the action of a person is clearly and palpably negligent, it is not within the province of the court to substitute its judgment for that of a jury which is provided for the purpose of deciding this as well as the other questions in the case. As was stated in *Thomas v. Buchanan,* 357 Ill. 270: 'The question of due care on the part of the plaintiff's intestate is always a question of fact to be submitted to a jury whenever there is any evidence in the record which, with any legitimate inference that may reasonably and legally be drawn therefrom, tends to show the exercise of due care on the part of the deceased.' " (*Blumb v. Getz,* 366 Ill. 273, 277.) It is a settled rule that the question of contributory negligence in a given case must be decided upon the particular facts of that case.

Defendant contends that "plaintiff was a licensee upon the premises of the defendant and the only obli-

gation the defendant owed to the plaintiff was to refrain from wilfully and wantonly injuring her. No such charge is made against the defendant in this case.'' Defendant further contends that even though plaintiff be considered as an invitee to defendant's office and washroom, that under no possible view of the evidence could she be considered an invitee into the room where the grease pits were located. Plaintiff contends that ''plaintiff was an invitee upon the premises of the defendant and was entitled to the exercise of reasonable care for her safety''; that the facts and circumstances in the case indicate an invitation to plaintiff to enter the room where the grease pits were and ''to traverse the premises along the pathway which resulted in this accident.''

''If appellee was a mere licensee and went upon appellants' premises for purposes of his own and was not for any purpose connected with the business of appellants he cannot recover without proof that appellants knowingly and willfully injured him. The owner of premises owes no duty to exercise ordinary care to keep his premises in a reasonably safe condition to persons who may be upon such premises as mere licensees. (3 Elliott on Railroads, sec. 1250; *Gibson v. Leonard,* 143 Ill. 182; *Illinois Central Railroad Co. v. Hopkins,* 200 id. 122.) If, as appellants contend, appellee was a mere licensee at the time of his injury he is not entitled to recover, and the court erred in overruling appellants' motion to direct a verdict. On the contrary, if appellee was on the premises at the time and place of the accident by the invitation, either express or implied, of appellants, they owed him the duty to exercise ordinary care for his safety while upon said premises.'' (*Pauckner v. Wakem,* 231 Ill. 276, 279.) In that case it was held that under the facts the plaintiff was lawfully upon the premises of the defendants by their implied invitation and that therefore they owed him the duty to exercise reasonable care for his safety while thereon. The court

further held (p. 282): "Here the invitation to appellee was to go into the warehouse to get such goods belonging to his employer as were wanted, and for this purpose the invitation must be held broad enough to give appellee the protection of the law *while lawfully upon that portion of the premises reasonably embraced within the object of his visit.*" (Italics ours.) Plaintiff relies upon the *Pauckner* case in support of her contention that she was an invitee when she entered the room where the grease pits were and had a right "to traverse the premises along the pathway which resulted in this accident."

In *Chattanooga Warehouse & Cold Storage Co. v. Anderson,* 141 Tenn. 288, 210 S. W. 153, 154, the court said: "Implied invitation is thus defined by Shearman & Redfield on Negligence (6th Ed.) sec. 706: 'Invitation by the owner or occupant is implied by law, where the person going on the premises does so in the interest or for the benefit, real or supposed, of such owner or occupant, or in the matter of mutual interest, or in the usual course of business, or where the person injured is present in the performance of duty, official or otherwise.' The great weight of authority, however, qualifies this definition of implied invitation by providing that where one goes upon the premises of another, for any of the purposes stated above, he must confine himself to such parts of the premises as are included in the invitation."

In *Southwest Cotton Co. v. Pope,* 25 Ariz. 364, 218 Pac. 152, 156, the court said: "We will grant in this case that Pope's visit was for the mutual advantage or common interest of both himself and the defendant, and that seems to be the principal criteria distinguishing a visitor from a licensee . . ., still his visit should have been confined to that part of defendant's premises set apart for the transaction of such business. . . . From the cases we think this rule, which we take almost word for word from *Ryerson v. Bathgate,* 67 N. J. Law,

337, 51 Atl. 708, 57 L. R. A. 307, is deducible: That the owner's liability for the condition of his premises is only coextensive with his invitation, and *it is incumbent upon a plaintiff to show not only that his entry upon the premises was by invitation of the owner, but also that at the time the injury was received he was in that part of the premises into which he was invited to enter, and was using them in a manner authorized by the invitation, whether express or implied.*'' (Italics ours.)

In *Shaw v. Goldman,* 116 Mo. App. 332, 92 S. W. 165, 167, the court said: ''And therefore it has been frequently held that even though one comes upon the premises lawfully, as by invitation to trade or to labor, and enters other portions thereof to which he was neither invited nor ordered, for the purpose of his own convenience, pleasure, or curiosity, he thereby becomes a licensee while occupying such portions of the premises to which he was neither invited nor ordered, and takes upon himself the risk of so doing, and in such case there is no duty incumbent upon the proprietor or the occupier of the premises to provide him a reasonably safe place, within the meaning of the rule hereinbefore indicated.'' Many other cases to the same effect might be cited, if it were necessary.

We may concede that plaintiff's evidence shows that she was an invitee to defendant's office and washroom, but we do not think that it shows that she was an invitee to the room where the grease pits were and had the right, as an invitee, to traverse that room as she did under the conditions that surrounded her.

However, in our opinion there is but one question necessary to decide in passing upon defendant's contention: Does plaintiff's evidence show that she was guilty of contributory negligence as a matter of law? We are constrained to answer that question in the affirmative. In reaching this conclusion we have kept in mind the settled rule that if plaintiff presented any evidence fairly tending to prove the allegation of her

complaint that at the time and place in question she "was walking on the said premises in the exercise of all due care and caution for her own safety," then it cannot be held that she was guilty of contributory negligence as a matter of law.

It is undisputed that the car was taken to defendant's premises so that Grabow "could fix the car up temporarily so that they could drive away," and that when plaintiff left the car to go to the washroom it was standing outside of the west end of the building, and was never moved from that position until Grabow had repaired it. The work was completed a short time after the accident, at which time plaintiff and Frank drove away in the car from defendant's premises. Plaintiff entered defendant's office for the sole purpose of going to the ladies' washroom. After remaining in the washroom for a few minutes she reentered the office. She testified that Chulos, the operator of the station, was then seated in the office. She did not return to the place where she had left her car to ascertain if it was still there, nor did she even speak to Chulos or to anyone else, although there were two colored attendants about the place. She testified that she had never been at the place before and that she was unfamiliar with the "set-up" of defendant's buildings and premises; that she knew she was in a strange place and would have to look out for herself; that when she came out of the rest room she saw that the door through which she had entered the office was closed; that she went through the doorway leading to the room where the grease pits were to go to her car, because she "supposed that it had been driven in to be repaired," and she thought the open door would lead directly to her car. Had she made an inquiry of Chulos she would have learned that cars were not repaired in that room but in a separate building, and that her car was still where she had left it. As soon as she stepped into the grease pit room she should have

known that her car was not being repaired there, because the room was in darkness. She does not claim that she saw any sign or heard any sound that would indicate that there was any person in the room or that work of any kind was being done there. As we have heretofore stated, the undisputed evidence is that the employees who worked in the room had ceased work some time before the accident. Under the conditions that confronted her the natural instinct of self-protection should have caused her to at once reenter the office. The unfamiliar place, the darkness, should have warned her not to proceed. She had just had an accident, due, apparently, to the fact that it was a "dark, hazy night," and that accident should also have tended to make her careful. She testified that after she entered the open door she traversed the room, as she did, because she thought that she would find her car next to the car parked there; and that when she got to the north end of the parked car she turned to the left, although she could then see nothing, not even the floor. Frank's testimony shows that between the north end of the parked car and the north end of the pit, the pit was exposed for about four feet. Although the pit was five feet wide and six feet deep plaintiff could not see the exposure, and as a consequence stepped into it. It is difficult to understand why she took the risks she did merely to ascertain if her car was parked in the place.

After giving to plaintiff the full benefit of her evidence and the law applicable thereto, we are forced to the conclusion that her injury resulted from her gross carelessness at the time of the accident and immediately prior thereto.

Holding, as we do, that plaintiff was guilty of contributory negligence as a matter of law, the judgment of the superior court of Cook county is reversed.

*Judgment reversed.*

JOHN J. SULLIVAN, P. J., and FRIEND, J., concur.