GAIL SWARTZ, Plaintiff-Appellee, v. SEARS, ROEBUCK AND COMPANY, Defendant-Appellant.

First District (5th Division)   No. 1—90—3439

Opinion filed May 14, 1993.

Arnstein & Lehr, of Chicago (Arthur Klein, Kurt Heinz, and Debra Williams, of counsel), for appellant.

Ialongo & Meyer, of Chicago (James Meyer and A. Mark Ialongo, of counsel), for appellee.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Plaintiff filed a negligence action after she was injured when she slipped on a puddle and fell in the service area of defendant's auto

service center. Plaintiff sought damages, alleging that the fall aggravated her preexisting multiple sclerosis. A jury awarded plaintiff $2,275,000 in damages but reduced the award by 50%, finding that plaintiff's actions constituted contributory negligence. On appeal, defendant argues that the trial court erred in refusing to grant a directed verdict in its favor because plaintiff slipped on "tracked-in" water, not a foreign substance, and consequently it owed plaintiff no duty. Even if plaintiff slipped on a foreign substance, defendant argues that a directed verdict was proper because plaintiff failed to offer sufficient evidence that it had notice of the puddle or that the puddle was the proximate cause of her fall. In the alternative, defendant contends that a new trial is warranted because the trial court erred in rejecting its proffered jury instructions, admitting certain expert witness testimony, and preventing its use of an evidence deposition. Lastly, defendant argues that the jury's verdict was legally inconsistent and against the manifest weight of the evidence.

## FACTS

On November 19, 1982, plaintiff, Gail Swartz, went tire shopping at defendant Sears, Roebuck & Co. (hereinafter Sears or defendant) store located in Vernon Hills. She entered the store's auto center through a garage door marked "Exit" and began walking through the auto service area. When she was halfway through the service area she slipped on a puddle and fell. According to the arguments of counsel, the accident occurred at 1:45 p.m. After seeking treatment for a variety of ailments, plaintiff was eventually diagnosed as having multiple sclerosis. She subsequently brought suit against Sears alleging that it was negligent in maintaining the service area and that as the result of the fall, her preexisting condition of multiple sclerosis was aggravated.

In preparation for trial, the judge granted several motions *in limine* including an oral motion *in limine* made by plaintiff which limited the number of experts who would testify at trial. The judge issued an order which provided "that no witness other than Drs. Kessler [plaintiff's expert] and Reder [defendant's expert] may be asked his or her opinion as to whether plaintiff's multiple sclerosis was or could have been exacerbated by her fall at Sears." At trial, the following testimony was heard.

Plaintiff first called Mike Herrick as an adverse witness pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1102). He testified that at the time of the accident he was a brake specialist employed by Sears at its Vernon Hills store. He stated that the auto center had two entrances, one for customers

and one for vehicles. Herrick testified that the vehicular door was left open at various times by employees or management and that it was open on the day of the accident. He explained that the auto service center had 22 service bays, 11 on each side, and that a person coming in through the vehicle entrance would normally see service bays for cars on the left and right with mechanics working on the cars.

On November 19, 1982, Herrick saw plaintiff enter through the vehicular door and proceed at a "fast shuffle" with her feet skidding across the floor as she walked. Herrick testified that he was going to say something to her, but did not. He explained that it was understood that Sears' employees were to tell customers not to enter through the vehicular door. He said that it was unusual for non-Sears employees to come through the vehicular door which contained a sign that read "Exit," but that it occurred from time to time.

According to Herrick, plaintiff's feet slipped out from under her and she fell backwards. He stated that plaintiff jumped right back up after the fall. Sears' security personnel took pictures of the area, questioned Herrick, and prepared a customer's accident report. Herrick testified that a customer accident report was filled out by Sears. Defendant's accident report stated that plaintiff was walking through the auto service center when she slipped and fell on rainwater brought in by cars. According to the report, it was rainy and cloudy on the day of the accident. The report also noted that plaintiff complained of pain in her back and elbow and that plaintiff's coat was soiled.

During his examination by plaintiff's counsel, Herrick identified a photograph in which he had previously marked a dark spot on the floor of the garage indicating that that was the spot where plaintiff fell. He testified that although he did not touch or feel the spot, he believed it to contain an accumulation of water. He also testified that he believed it was raining at the time of the occurrence. Herrick conceded that cars sometimes leaked oil and gas when pulled in and out of the service bays and that he had seen oil on prior occasions in the aisle between the service bays. Although customers are not supposed to, they will sometimes drive their car into the service area, but they would never drive their cars into the bays. Herrick testified that the floor of the auto center was cleaned at night.

Plaintiff, Gail Swartz, testified that on the day of the accident she and her mother went to Sears to buy tires for her car. Plaintiff did not recall what the weather was like that day. She stated that they were walking toward the customer entrance, but noticed that a trailer was blocking it. The trailer had a sign on it that said "tire sale." There was no tractor in front of the trailer.

Halfway between the trailer and the garage, plaintiff's mother suggested that they enter through the vehicular door as other people were doing. Plaintiff stated that upon entering the auto service center, her mother asked a Sears employee about the tire sale and the employee directed them into the garage to the service desk which was all the way at the back and at the right of the garage.

They began walking to the service desk, plaintiff's mother walking in front. Plaintiff stated that she fell about halfway through the service area. According to plaintiff, she took a step and "both feet flew out" in front of her. She put down her right elbow, her head snapped back, and she fell on her back.

Plaintiff testified that she was stunned and did not know whether she got up without any assistance. At the instruction of a mechanic, she went to the front desk, and while waiting for further assistance, she realized that her keys were missing and went to retrieve them. She found her keys near a puddle of oil. She determined that the puddle was oil after putting the toe of her shoe into the puddle. Plaintiff testified that her coat was ruined because the entire back of it was covered with oil.

Plaintiff said that she was hospitalized in 1967 because she could not walk and had recurrences of this problem in the early 1970s. She never had any other difficulties with her legs until the accident. Immediately after the accident, she experienced pain in her legs and lower back. Plaintiff testified that she sought treatment after the pain grew worse and she developed bladder troubles. Over the course of treatment, her condition generally deteriorated. Plaintiff said that she developed numbing sensations and experienced uncontrollable spasms in her legs. After she was hospitalized in 1984, plaintiff was diagnosed as suffering from multiple sclerosis by a doctor whom she did not identify.

On cross-examination, plaintiff admitted she had been to this store before and knew of the customer service entrance. She did not know if she could have entered by going behind the trailer on the day of the accident because she did not get close enough to it. She conceded that the first time she saw that there was oil where she fell was when she returned to get her keys. She did not remember seeing any footprints in the puddle except for "maybe" one of her shoe prints. She testified that she could not remove the oil stain from her coat and that she either gave or threw that coat away. She admitted that she did not know how the substance got on the floor or how long it had been there. She testified that she did not think that it was raining that day.

Prior to the testimony of Gail Swartz, Bernice Magdid, plaintiff's

mother, testified. She stated that she arrived at the service center with her daughter. Her testimony as to how they entered was consistent with plaintiff's testimony. She stated that they were walking toward a truck trailer with a sign advertising a tire sale when she told plaintiff that people were entering through the vehicular door and suggested they enter that way as well. She testified that they conversed as they were walking through the service bays with plaintiff trailing behind. Magdid discovered that plaintiff had fallen when, after realizing that plaintiff was not walking right behind her, she turned around and saw plaintiff lying flat on her back. Magdid was permitted without objection to testify that plaintiff was not shuffling, skidding, running, or walking fast before she fell. Magdid testified that after her fall plaintiff was stunned. She sat up and remained in a seated position for a few minutes before she stood.

According to Magdid, the floor where plaintiff fell was very greasy looking and had a "big black glob" on it. After plaintiff got up, they started to walk to the counter when plaintiff realized that she did not have her keys. They went back to the spot where plaintiff fell and found her keys. After they left Sears, plaintiff seemed bewildered and told Magdid that the back of her head, her elbow, lower back and legs hurt.

On cross-examination, Magdid testified that she did not see any other door than the one which they entered. She conceded that she did not see plaintiff fall, but did see plaintiff lying in a puddle of what appeared to be grease. She admitted that she did not know how long the spot was there, how it got there, or if the spot contained any footprints.

Dr. James McGinn testified that he was a licensed chiropractic physician in Illinois. He first examined plaintiff in December 1982 and continued to treat her until August 1983. According to Dr. McGinn, plaintiff's initial complaints were pain in her lower back, thighs, heels and legs. In December 1982, plaintiff complained that the pain in her left leg was becoming constant and said that she suffered from urinary infrequence and urgency since the accident. In March 1983, plaintiff indicated that in addition to leg and back pain she was experiencing numbness in her heels, and in July 1983, plaintiff also developed numbness in her hands. He testified that plaintiff's medical history did not indicate that any of these symptoms were present prior to the accident. McGinn testified that plaintiff's injuries were, in his opinion, the result of an event of trauma.

Dr. Elizabeth Kessler, a general neurologist who attended medical school at the University of Chicago, testified that she has been a board-certified neurologist since 1979 and had five years of post-

graduate residency at Rush-Presbyterian-St. Luke's Hospital, including three in neurological residency. For four years she was a full-time assistant professor in the department of neurology at Rush-Presbyterian. Afterwards, she continued with her faculty appointment and practiced general neurology at several different hospitals. In addition to her teaching position at Rush-Presbyterian, she is an assistant professor in the department of psychiatry at Chicago Medical School. Dr. Kessler stated that in her practice she sees patients with a variety of neurological disorders including multiple sclerosis.

Dr. Kessler first saw plaintiff on March 3, 1990, and took a detailed medical history from her. Plaintiff disclosed her problems walking as a young adult in 1967 and in the early 1970s, the details of her fall in 1982, her resulting problems and symptoms, and her earlier treatment by Dr. McGinn. Dr. Kessler testified that in her opinion, plaintiff was suffering from multiple sclerosis. She said that the plaintiff's fall exacerbated the multiple sclerosis and caused her condition to progressively deteriorate with increasing weakness and numbness in the legs and bladder difficulties. Dr. Kessler opined that plaintiff's first episode of multiple sclerosis occurred in 1967 when she was 18 and was hospitalized for back surgery and the second episode occurred in the earlier 1970s when plaintiff experienced problems walking. Dr. Kessler explained that people who have suffered even relatively minor head trauma may have their multiple sclerosis symptoms aggravated.

On cross-examination, Dr. Kessler admitted that she saw plaintiff only twice and did not review the post-accident medical records of Dr. McGinn or Dr. Stone, an orthopedist who saw plaintiff once. Dr. Kessler conceded that in forming her opinion she relied on certain literature which was "controversial." She testified that a number of well-respected neurologists have opined that multiple sclerosis can be exacerbated by trauma, while others have come to the contrary conclusion. Dr. Kessler stated that she was familiar with William Sibley's study, one of the most recent in the area of trauma and multiple sclerosis, and conceded that Sibley concluded that there was no correlation between trauma and multiple sclerosis.

Defendant's first witness was Dr. Anthony T. Reder, who testified that he was a board-certified neurologist with a special interest in immunology and multiple sclerosis. Since 1984, he has been affiliated with the University of Chicago hospital, where he researches, teaches, and sees patients. He testified that about 80% of his time is spent on research related to multiple sclerosis and that he had authored 85 treatises, the majority of which impact upon multiple sclerosis in some manner.

Dr. Reder stated that after reviewing plaintiff's hospital records, Dr. McGinn's notes, and clinic notes from a number of doctors whom he did not specify, he concluded that the fall at Sears did not cause or exacerbate plaintiff's multiple sclerosis. He stated that the medical records indicated that plaintiff experienced bilateral leg and heel pain and that such bilateral leg and heel pain were not typical multiple sclerosis symptoms. Dr. Reder opined that even the authorities relied on by Dr. Kessler would not support plaintiff's claim because her symptoms did not appear within the expected period of time following the accident.

On cross-examination, Dr. Reder conceded that in forming his opinion he primarily relied on the Sibley study, although there were others which supported his opinion. He acknowledged that some studies done by reputable and recognized neurologists have concluded that a link between trauma and multiple sclerosis might exist. Dr. Reder also conceded that Dr. McGinn's notes indicated that there was numbness in plaintiff's heel and urinary infrequence since the accident, both possibly indicating neurological problems.

Ronald Kaufman testified that he was employed by Sears at the Vernon Hills store at the time of the occurrence and was currently the automobile service manager at that store. He stated that in his 10 years at Sears he never saw a trailer parked near the customer entrance. Kaufman testified that the store had a policy to keep oil or grease off the floor and that everyone was instructed to clean up such spills right away. He said water is constantly squeegeed off cars when it is raining or snowing and there is a floor drain running down the center aisle.

On cross-examination, he conceded that grease and oil get on the floor of the garage and that customers do enter through the vehicular door, although employees "try to stop them." Kaufman acknowledged that there is no sign prohibiting entrance or warning customers not to walk through the service area near the vehicular door. There is an exit sign over that door.

Herrick was then called in defendant's case in chief and testified that he did not see a trailer parked in front of the customer service entrance on the day of the accident, nor on any other day in the 10 years he worked there.

Defendant then attempted to introduce a portion of an evidence deposition, taken by plaintiff, of Dr. Robert Stone, an orthopedist who had examined plaintiff. In that portion of the evidence deposition, in response to a question posed by counsel for plaintiff, Dr. Stone denied that plaintiff exhibited symptoms of multiple sclerosis when he examined her in May 1983. Plaintiff objected to the

admission of the deposition at trial, contending that it violated the court's order *in limine* because Stone's deposition contained an opinion on multiple sclerosis. The trial court sustained plaintiff's objection to admission of Dr. Stone's deposition on that ground.

On rebuttal, plaintiff's counsel introduced the National Weather Service report which listed the hourly precipitation measures on the day of the accident. The data showed that at noon and 1 p.m. there was a trace amount of precipitation on the ground. At 2 p.m., one-hundredth of an inch of rain was recorded. Although not read to the jury, the report which is part of the record on appeal indicates that a total of .48 inches of rain fell on November 19, 1982; all of the measurable rain, except for the one-hundredth of an inch measured in the hour ending at 2 p.m., fell after the accident. There were indications of trace amounts of rain in some of the earlier hours.

At the instruction conference, defendant proffered certain instructions on defendant's notice of the foreign substance and on natural accumulations which the trial judge refused. Defendant's instruction No. 15 was a non-Illinois Pattern Jury Instruction (hereinafter IPI), which provided:

> "If you determine that plaintiff's fall was caused by the presence of a foreign substance on the defendant's floor, you must then determine whether defendant had notice of this condition. You may find that the defendant had notice of this condition if you determine that the substance was placed on the floor by the defendant's negligence, that the defendant's employees knew of its presence, or the substance was on the floor for a sufficient length of time so that, in the exercise of ordinary care, its presence should have been discovered. However, if you determine that the defendant did not have notice of the substance, then you may not impose liability on the defendant."

The trial court refused this instruction, ruling that the question of defendant's liability for a fall on a foreign substance can go to the jury without a showing that defendant had notice of the substance when the product is one related to defendant's business.

Defendant's instructions Nos. 16, 17, 18, and 19 were non-IPI instructions which defined "natural accumulation," provided that a landowner is under no duty to remove or warn of tracked-in water, and that a finding for defendant was required if plaintiff's injury was proximately caused by a natural accumulation. The trial court refused defendant's instructions Nos. 16 through 19, stating that the basic negligence instruction was sufficient.

Defendant's tendered instructions 24, 25, 26, and 27 were IPI and modified IPI instructions which asked the jury to determine whether

plaintiff was a licensee or an invitee and indicated the different standard of care that attaches to such determination. The trial court rejected these instructions, finding that plaintiff was an invitee as a matter of law.

The jury subsequently returned a verdict for plaintiff assessing the total amount of damages suffered by the plaintiff as $2,275,000. The jury itemized the damages as follows:

"The aggravation of her pre-existing condition      $     0

The disability resulting therefrom      $ 919,500

The pain and suffering experienced and

reasonably certain to be experienced in

the future as a result of the injuries.      $1,355,500"

The jury then indicated that plaintiff was guilty of contributory negligence and reduced the award by 50%. After defendant's post-trial motion was denied, defendant filed this appeal.

### OPINION

On appeal, defendant argues that the trial court erred in denying its motion for a directed verdict or in the alternative for refusing to give certain tendered instructions to the jury. Defendant contends that the trial court should have directed a verdict in its favor because the puddle on which plaintiff slipped was a natural accumulation of tracked-in water and therefore it did not owe a duty to plaintiff. Alternatively defendant contends that even if the evidence of a natural accumulation is insufficient to warrant a directed verdict, the trial court committed reversible error when it refused its natural accumulation instructions. Secondly defendant further argues that even if the puddle was not a natural accumulation and was comprised of a foreign substance, it was entitled to a directed verdict because plaintiff did not offer any evidence establishing that it had actual or constructive notice of the substance. Defendant further contends that it was entitled to a directed verdict because there was insufficient evidence to establish that the puddle, regardless of its composition, was the proximate cause of plaintiff's injuries. Defendant raises several other alleged errors which it claims warrant a new trial, including the trial court's ruling that plaintiff was an invitee as a matter of law, its decision to allow Dr. Kessler to give expert witness testimony, its exclusion of Dr. Stone's evidence deposition, and the "irreconcilably inconsistent" verdict returned by the jury. For the reasons discussed below, we reverse and remand.

Defendant's first contention on appeal is that the trial court should have directed a verdict in its favor because the evidence was overwhelming that the puddle on which plaintiff slipped was a natu-

ral accumulation of rainwater that was tracked into the auto service center. We disagree.

The defendant is correct in asserting that courts have consistently held that a landowner is not liable for injuries sustained by plaintiffs who slipped on water that is tracked into a building from natural accumulations outside. (*Lohan v. Walgreens Co.* (1986), 140 Ill. App. 3d 171, 174, 488 N.E.2d 679, citing *Moran v. St. Paul Federal Savings & Loan Association* (1967), 83 Ill. App. 2d 478, 228 N.E.2d 97.) A landowner has no duty to protect others from tracked-in water even if aware that the presence of the water has resulted in a dangerous condition. (*Lohan*, 140 Ill. App. 3d at 175; *Wolter v. Chicago Melrose Park Associates* (1979), 68 Ill. App. 3d 1011, 386 N.E.2d 495.) Nor will a voluntary undertaking to remove tracked-in water or minimize the hazard posed by it create such a duty unless these efforts exacerbate the danger. (*Lohan*, 140 Ill. App. 3d at 175.) A landowner will only be held liable if the plaintiff's "injury occurred as a result of water 'produced or accumulated by artificial causes or in an unnatural way or by defendant's own use of the area concerned and creation of the condition.' " *Walker v. Chicago Transit Authority* (1980), 92 Ill. App. 3d 120, 122, 416 N.E.2d 10, quoting *McCann v. Bethesda Hospital* (1979), 80 Ill. App. 3d 544, 548, 400 N.E.2d 16.

■ Although the absence of a duty on the part of the landowner is well established with respect to natural accumulations, the evidence here that the puddle was not comprised of tracked-in water but of a foreign substance is considerable. Both plaintiff, who was the only one to touch the puddle, and her mother testified that the puddle was composed of oil or grease. There was additional evidence that plaintiff's coat was soiled and that there were prior occasions where oil was on the garage floor, from which it could be inferred that the puddle was composed of oil. Consequently, the trial court correctly denied plaintiff's motion for a directed verdict on this ground.

However, we agree with defendant's alternate contention that the trial court committed reversible error in denying its tendered instructions 16 through 19 on the law of natural accumulation.

A trial court must instruct the jury on all issues raised by the evidence. (*Erickson v. Muskin Corp.* (1989), 180 Ill. App. 3d 117, 535 N.E.2d 475.) The determination of which issues have been raised are within the court's discretion, and where there is no evidence to support an issue, a trial court's refusal to instruct on that issue is proper. (*Kemnitz v. Semrad* (1990), 206 Ill. App. 3d 668, 565 N.E.2d 1.) A party, however, has the right to have a jury instructed on its theory if there is some evidence in the record to support the theory. *Caballero v. Royston* (1991), 219 Ill. App. 3d 477, 579 N.E.2d 994;

*Bankston v. Chesapeake & Ohio Ry. Co.* (1984), 128 Ill. App. 3d 166, 470 N.E.2d 512.

Plaintiff contends that the trial court correctly refused defendant's instructions Nos. 16 through 19 because they were non-IPI and did not correctly state the law. Plaintiff is correct in asserting that pattern jury instructions should be used unless they do not accurately state the law. (*Marin v. American Meat Packing Co.* (1990), 204 Ill. App. 3d 302, 562 N.E.2d 282.) Non-IPI instructions, like those offered by defendant, will be given to the jury only when the pattern instructions are inadequate or lacking. *Erickson v. Muskin Corp.* (1989), 180 Ill. App. 3d 117, 535 N.E.2d 475.

■ At the time of trial, there were no Illinois Pattern Jury Instructions on natural accumulation or tracked-in water. In rejecting defendant's natural accumulation instructions, the trial court stated that the pattern general negligence instruction would be sufficient in this case. In this respect, the trial court erred. (See *Foster v. George J. Cyrus & Co.* (1971), 2 Ill. App. 3d 274, 278, 276 N.E.2d 38 (trial court committed reversible error in giving instruction which stated that defendant landowner owed a duty of due care to plaintiff and thus had to remove natural accumulation within a reasonable time because "jury could have found that the mound of snow was a natural accumulation, but nevertheless held defendant liable for not removing the snow within a reasonable time").) The law of natural accumulation is decidedly different than the law governing general negligence as the finding of a natural accumulation would preclude the imposition of liability upon defendant unless defendant created an unnatural accumulation through its conduct. Considering the unequivocal absence of a duty if a natural accumulation is found, the general pattern instructions which provide that defendant owes a duty of due care to plaintiff, regardless of the puddle's composition, are an incorrect statement of the law and therefore non-pattern jury instructions were appropriate. See *Foster*, 2 Ill. App. 3d 274, 276 N.E.2d 38; see also *Wolter v. Chicago Melrose Park Associates*, 68 Ill. App. 3d at 1020-21.

That the general pattern instructions are inadequate, however, does not necessitate a finding that the trial court erred in refusing to accept defendant's instructions. The test for determining whether jury instructions are proper is whether they form a clear and adequate picture of the applicable law when viewed in their entirety. (*Galowich v. Beech Aircraft Corp.* (1991), 209 Ill. App. 3d 128, 568 N.E.2d 46.) The instructions must fully, fairly, and comprehensively inform the jury of applicable legal principles (*Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.* (1990),

196 Ill. App. 3d 5, 552 N.E.2d 1151) and must not overemphasize a particular factor. (*Brandt v. Uptown National Bank* (1991), 212 Ill. App. 3d 621, 571 N.E.2d 531.) Even if instructions accurately state the law, they should not be given if they are argumentative or misleading. *Gordon v. Chicago Transit Authority* (1984), 128 Ill. App. 3d 493, 470 N.E.2d 1163.

Defendant's instruction No. 16 defined "natural accumulation" as "substances that have been caused by the weather, such as water including such substances that have been tracked-in." Defendant's instruction No. 17 provided that "[t]he owner of property is under no duty to remove tracked-in water from natural accumulations." Defendant's instruction No. 18 stated that "[t]he owner of property is under no duty to warn of natural accumulations or potential hazards caused by such natural accumulations even if he knows of them." Defendant's instruction No. 19 provided, "If you find that plaintiff's injury was proximately caused by slipping on a floor made wet by a natural accumulation of tracked-in water you must find for the defendant."

Plaintiff contends that these instructions were properly refused because they did not correctly state the law. According to plaintiff, the instructions fail to provide for the fact that the water could not have been a natural accumulation if it was brought in by defendant's employees because the law of "tracked-in" water is limited to pedestrian traffic. Defendant asserts that this distinction is immaterial because the law of natural accumulation is predicated on the inevitable effects of inclement weather rather than on the right of the employer to exercise control over those who actually "tracked-in" the water.

This issue was previously addressed by this court in *Choi v. Commonwealth Edison Co.* (1991), 217 Ill. App. 3d 952, 578 N.E.2d 33. The *Choi* plaintiff was an employee of an independent contractor engaged by the defendant landowner. The plaintiff was carrying ice-covered pipes, which had been stored outside, into defendant's building. He was injured when he slipped on a puddle of water which accumulated after the ice and snow on the pipes melted. This court rejected plaintiff's argument that defendant's acts, storing the pipes outdoors and then requiring that they be brought directly indoors without deicing them, precluded the application of the general rule that a landowner is not liable for injuries resulting from "tracked-in" water. In so doing, the court found that the puddles which resulted from transporting the ice-covered pipes were a "continuation of a natural accumulation" and that plaintiff would have had to "make an affirmative showing of an unnatural accumulation or an aggrava-

tion of a natural condition" to establish a duty. *Choi*, 217 Ill. App. 3d at 957.

The *Choi* court specifically rejected plaintiff's argument that the rule of nonliability was limited to the instances of water "tracked-in" by pedestrian traffic. (*Choi*, 217 Ill. App. 3d at 956-57.) Rather, the court looked at the defendant's conduct to see whether defendant created an unnatural accumulation or aggravated a natural condition.

■ Plaintiff's argument that a departure from the general rule of nonliability is warranted because defendant's employees usually drove the cars into the service area consequently fails under *Choi*. That defendant's employees may have driven the cars that tracked in the water is an insufficient basis to determine that an unnatural accumulation was present as a matter of law. The water in this case is more indicative of a "continuation of a natural accumulation" rather than an unnatural accumulation. Regardless of who drove the cars into the service area, the result would have been the same: water would have dripped off the cars. While defendant's conduct could prevent it from seeking shelter under the rule of nonliability when that conduct results in a creation of an unnatural accumulation, this case does not present such an instance.

The cases of *Walker v. Chicago Transit Authority* (1980), 92 Ill. App. 3d 120, 122, 416 N.E.2d 10, and *Johnson v. Sears, Roebuck & Co.* (1989), 186 Ill. App. 3d 725, 542 N.E.2d 841, cited by plaintiff are inapplicable. These cases do not hold that the natural tracking-in of water by defendant's employees defeats the rule of natural accumulation. In *Walker*, plaintiff slipped and fell on a large puddle of water which was tracked in by commuters. In *Johnson*, plaintiff slipped in the entranceway of defendant's store on a mixture of water tracked in by customers and a bag of garden soil which defendant had stacked near the entrance. In both of these cases, the question raised was whether the defendant created an unnatural condition which caused an unnatural accumulation. As pointed out in this case, no such unnatural condition was created and, consequently, whether a customer or one of defendant's employees drives in the cars does not change the nature or character of the accumulation.

Viewing the instructions as a whole, we determine that they provide a brief, correct and impartial statement of the law of natural accumulation. The instructions correctly define natural accumulation and specifically provide that the landowner owes no duty to protect from injuries resulting from a natural accumulation. That these instructions do not specifically include any mention of the possibility of the presence of an unnatural accumulation does not impact on their use. No evidence of any unnatural accumulation was presented

to the jury because plaintiff's theory throughout trial was one based on the presence of a foreign substance. The jury would have been confused by instructions which presented the issue of unnatural accumulation when plaintiff did not argue that theory. As such, an instruction on unnatural accumulation would have been confusing and prejudicial. See *Graves v. Wornson* (1978), 56 Ill. App. 3d 873, 371 N.E.2d 692; *Shapiro v. City of Chicago* (1941), 308 Ill. App. 613, 32 N.E.2d 338.

In so holding, we note that neither the trial judge nor the parties raised any question whether the evidence of rain in the record was sufficient to warrant the giving of the natural accumulation instructions. Here, although the evidence of precipitation prior to the accident is relatively thin, it is sufficient to constitute "some" evidence and warrant the giving of defendant's natural accumulation instructions. Herrick testified that he believed it was raining at the time of the accident. The Sears accident report also indicated that the weather on the day of the accident was cloudy and rainy. Finally, the National Weather Service report recorded that a measurable amount of rain had fallen in the hour of the accident. Consequently, the trial judge erred in refusing to tender defendant's instructions 16 through 19 when the Illinois pattern general negligence instructions were inadequate, the defendant's instructions correctly stated the law and where there was sufficient evidence to warrant the giving of those instructions.

The trial court also committed reversible error in determining that the plaintiff was an invitee as a matter of law. Although the Premises Liability Act (Ill. Rev. Stat. 1989, ch. 80, par. 301 *et seq.*) abolished "the common law [distinction] between invitees and licensees as to the duty owed by an owner *** of any premises to such entrants" (Ill. Rev. Stat. 1989, ch. 80, par. 302), courts have consistently held that the Act is not retroactive and consequently Illinois common law applies in this case. *O'Donnell v. Electro-Motive Division of the General Motors Corp.* (1986), 148 Ill. App. 3d 627, 499 N.E.2d 608.

Under common law, a landowner owes an invitee the duty to exercise reasonable care in keeping its premises safe for the invitee's use while the landowner only need warn a licensee of any hidden dangers of which he has knowledge and refrain from injuring him willfully. (*Barmore v. Elmore* (1980), 83 Ill. App. 3d 1056, 403 N.E.2d 1355.) A person will be considered an invitee on the land of another when " '(1) he enters by invitation, express or implied, (2) his entry is connected with the owner's business or with an activity the owner conducts or permits to be conducted on his land and (3) there is a

mutuality of benefit or a benefit to the owner.' " (*Lutz v. Goodlife Entertainment, Inc.* (1990), 208 Ill. App. 3d 565, 569, 567 N.E.2d 477, quoting *Barmore*, 83 Ill. App. 3d at 1058-59.) The factual determination of whether a person is an invitee is generally a question for the jury. *Fugate v. Sears, Roebuck & Co.* (1973), 12 Ill. App. 3d 656, 673, 299 N.E.2d 108; *Bozarth v. McGrath Sand & Gravel Co.* (1971), 133 Ill. App. 2d 713, 715, 271 N.E.2d 374 ("[g]enerally speaking if there be a dispute concerning whether a person is on a portion of the premises within the terms of an express or implied invitation or is using said premises in accord with said invitation such questions are properly submitted to and resolved by the jury").

■ Although it is undisputed that plaintiff's entry on the premises was connected with the owner's business and for a mutually beneficial purpose, there is a jury question whether there was an invitation by defendant, either express or implied, for plaintiff to enter the land in the manner that she did. See *Augsburger v. Singer* (1968), 103 Ill. App. 2d 12, 242 N.E.2d 436 (improper to direct a verdict although purpose for which plaintiff entered defendant's trailer was clearly sufficient to render him an invitee because jury question still existed on whether there was a sufficient invitation on defendant's part to establish invitee status).

In this case, plaintiff entered through a vehicular door which was designed for use by cars, not pedestrians. The area into which she entered was obviously a work area with 22 service bays and mechanics repairing cars in plain view. Moreover, the vehicular door was marked as an exit from the garage area, not as an entrance into the store. (*Cf. Brett v. Century Petroleums, Inc.* (1939), 302 Ill. App. 99, 23 N.E.2d 359 (plaintiff, who was an invitee as to plaintiff's washroom and office, lost that status when she entered grease pit room despite the fact that the room was dark and had a "No Admittance" sign).) Although an exit sign does not *per se* prohibit entry, it unequivocally indicates the defendant's intended use for that door and thus, by its very nature, suggests that entry through that door is not desired. These factors could have alerted plaintiff to the fact that defendant's invitation to customers did not extend to entrance through the vehicular door or to the area that that door accesses. See *Coken v. Peterson* (1950), 340 Ill. App. 518, 92 N.E.2d 352 (plaintiff's status on defendant's land was a question of fact for the jury to decide where plaintiff was injured when she went through two double doors into a dark area looking for a washroom after seeing several other women using those double doors and hearing on an earlier visit that a new women's washroom was being constructed on the premises); accord *Jones v. Granite City Steel Co.* (1969), 104 Ill.

App. 2d 379, 244 N.E.2d 427 (plaintiff who was employed by tenant of defendant landowner exited building through a door used by tenant's employees and was injured when she fell in the parking lot while walking to her car; in determining that plaintiff's status was a question for the jury, court noted that there was no indication that plaintiff was prohibited from using a different exit which was considerably closer to her car in spite of the fact that such exit was used primarily by the landowner's employees); *Larson v. Illinois Central R.R. Co.* (1954), 2 Ill. App. 2d 102, 118 N.E.2d 886 (trial court properly submitted question of plaintiff's status to the jury when evidence demonstrated that plaintiff arrived at north end of defendant's train depot and, instead of entering through the doors at that end of the depot, decided to walk around the depot in the dark and enter through the depot's south doors).

Significantly, plaintiff admitted that she knew of the customer service entrance, but used the vehicular door because a trailer was blocking the customer service entrance and she saw other people entering that way. The reasons given by plaintiff for her use of the vehicular door instead of the customer service door are insufficient to support a determination as a matter of law that she was an invitee. Defendant consistently challenged the presence of the trailer and her testimony about the trailer was undercut by her admission that she did not get close enough to determine whether it prevented the use of the customer service entrance. Moreover, as previously noted in *Coken*, that plaintiff saw others entering through the vehicular door is insufficient to establish her status as a matter of law. See *Coken*, 340 Ill. App. at 522.

Accordingly, in cases such as this one, where plaintiff's status is arguably based on which exit or entrance was used to gain access to or leave defendant's property, such status is a question for the jury. (See *Jones*, 104 Ill. App. 2d at 383-84; *Larson*, 2 Ill. App. 2d at 105.) Here, the evidence bearing on plaintiff's status can support conflicting inferences over which reasonable men may differ therefore requiring the submission of this question to a jury.

We next address defendant's further contentions that the trial court erred in not directing a verdict in its favor because such error, if found to be present, would necessitate an outright reversal rather than a remandment for a new trial.

Defendant contends that the trial court erred in refusing to grant its motion for a directed verdict because plaintiff failed to establish that it had actual or constructive notice of the oil on the floor. In the same vein, defendant contends that the trial court committed reversible error by rejecting defendant's instruction No. 15 which would have instructed the jury on the need for notice on defendant's part.

Generally, a proprietor is not liable to a customer who slips on a foreign substance and falls where there is no evidence that "(1) the substance was placed there by the negligence of the proprietor, or (2) his servant knew of its presence, or (3) the substance was there a sufficient length of time so that, in the exercise of ordinary care, its presence should have been discovered, *i.e.*, the proprietor had constructive notice of the substance." (*Hayes v. Bailey* (1980), 80 Ill. App. 3d 1027, 1030, 400 N.E.2d 544; see also *Olinger v. Great Atlantic & Pacific Tea Co.* (1961), 21 Ill. 2d 469, 173 N.E.2d 443.) Plaintiff presented no evidence which demonstrated that defendant had actual or constructive notice of the substance on the floor or any evidence that the particular substance was placed there as a result of defendant's negligence.

However, it is not necessary for plaintiff to offer evidence showing that defendant had notice of the substance on the floor when the nature of the substance indicates that there was no conceivable way that the substance could have been on the floor other than through the agency of defendant's employees. *Sundberg v. Boal* (1943), 320 Ill. App. 138, 49 N.E.2d 824 (abstract of opinion).

The test for determining when the nature of the substance negates the need for proof of notice was established by our supreme court in *Donoho v. O'Connell's, Inc.* (1958), 13 Ill. 2d 113, 148 N.E.2d 434. The court stated:

> "Where, however, in addition to the fact that the substance on the floor was a product sold or related to defendant's operations, the plaintiff offers some further evidence, direct or circumstantial, *however slight*, such as the location of the substance or the business practices of the defendant, from which it could be inferred that it was more likely that defendant or his servants, rather than a customer, dropped the substance on the premises, courts have generally allowed the negligence issue to go to the jury, without requiring defendant's knowledge or constructive notice." (Emphasis added.) (*Donoho*, 13 Ill. 2d at 122.)

The *Donoho* court framed the issue as not whether defendant or its agents placed the substance on the floor, but rather whether the evidence makes it more probable that defendant or its agents did so. *Donoho*, 13 Ill. 2d at 125.

■ It is a matter of common knowledge that oil and grease are commonplace in a garage. Consequently, it is highly improbable that, considering the nature of the substance and its location, it was placed on defendant's floor by anyone other than its employees. Here, defendant's own employees confirmed that they were the ones who drove any such vehicles into the garage area. Moreover, there was

testimony by plaintiff and her mother which established the location of the substance, including the testimony concerning the keys and oil damage to her coat, and additional evidence, primarily testimony of defendant's employees that cars would leak oil or gas and that oil was on the floor on prior occasions, to establish that it was more probable that the substance was present as the result of defendant's negligence. This evidence is sufficient to meet the requirements of *Donoho* and, consequently, there was no need for plaintiff to present evidence of defendant's notice of the substance. The trial judge correctly denied defendant's motion for a directed verdict on this basis. See *Little v. Metropolis IGA Foods, Inc.* (1989), 188 Ill. App. 3d 136, 141, 544 N.E.2d 28 (motion for summary judgment not proper where "jury could reasonably infer that a grape on the floor of a grocery store, in the produce aisle, near a door to a back room for employees only was caused to be there by the negligence of the store"); *Mraz v. Jewel Tea Co.* (1970), 121 Ill. App. 2d 209, 257 N.E.2d 548 (finding that defendant's employees were only possible source of dropped lettuce leaf on which plaintiff slipped was supported by evidence which showed that lettuce was related to defendant's business and that defendant had been negligent in failing to properly maintain store).

Another variant of the *Donoho* principle which obviates special proof of notice is where defendant knew of prior occasions where the same type of substance was present on the floor creating a potentially dangerous situation. *Perminas v. Montgomery Ward & Co.* (1975), 60 Ill. 2d 469, 328 N.E.2d 290; *Nicholson v. St. Anne Lanes, Inc.* (1985), 136 Ill. App. 3d 664, 483 N.E.2d 291.

In *Perminas v. Montgomery Ward & Co.* (1975), 60 Ill. 2d 469, 328 N.E.2d 290, plaintiff fell when he slipped on a small triangular-shaped object with wheels which was displayed on low shelves in defendant's store. There was no evidence which indicated how the particular object got on the floor, how long it had been there, or whether the defendant knew it was on the floor. (*Perminas*, 60 Ill. 2d at 472.) The Illinois Supreme Court looked to testimony by one of defendant's employees which established that on prior occasions people used these objects to skate up and down the aisles of defendant's store and that these objects were often found on the floor. The court stated that there was sufficient evidence of defendant's negligence "in spite of plaintiff's inability to offer any specific evidence regarding the manner in which the particular attachment which caused his accident reached the floor" when defendant failed to correct the potentially dangerous situation or warn its customers of it. *Perminas*, 60 Ill. 2d at 475.

Accord *Nicholson v. St. Anne Lanes, Inc.* (1985), 136 Ill. App. 3d 664, 483 N.E.2d 291. There, plaintiff slipped on a small bar of soap in the bathroom of a bowling alley. Defendant contended that a judgment notwithstanding the verdict should have been entered in its favor because plaintiff did not demonstrate that it had notice of the soap on the floor. After confirming the general rule requiring notice of the hazard, the *Nicholson* court noted that one of defendant's employees had testified that he had observed soap on the bathroom floor on one or two occasions and that he knew that this posed a potentially dangerous situation. The court reasoned that this prior knowledge of the dangerous situation, albeit based on only one or two prior observations, was sufficient to bring the case within the dictates of *Perminas.*

In the case before us, the testimony of defendant's own employees affirmatively establishes that the situation here is akin to that in *Nicholson* and *Perminas.* Herrick testified that he had seen oil in the aisle in the middle of the auto service center on prior occasions and that sometimes cars leaked gas and oil when they were driven into the auto service center. Likewise, Kaufman conceded that grease and oil gets on the floor of the garage. Thus, this testimony demonstrates defendant's awareness of the potentially dangerous recurring situation created by the oil on the floor of the garage. Moreover, defendant's own policies, that employees were supposed to stop customers from entering the garage and that oil and grease were to be kept off the floor and all spills cleaned up immediately, establish that it knew this was a potentially dangerous situation. We therefore hold that the trial court did not err in denying defendant's motion for a directed verdict even though plaintiff did not affirmatively show that defendant had actual notice or constructive notice of the particular substance or that the substance had been placed there by its negligence.

Obviously the same reasons that support the court's decision to deny defendant's motion for a directed verdict also justify its refusal to give defendant's proffered instructions on notice. Defendant's instruction No. 15, a non-IPI instruction culled from *Hresil v. Sears, Roebuck & Co.* (1980), 82 Ill. App. 3d 1000, 403 N.E.2d 678, and *Hayes v. Bailey* (1980), 80 Ill. App. 3d 1027, 400 N.E.2d 544, provided that in order to find defendant liable, defendant must have had notice of the condition in question.

Defendant's final basis for arguing that the trial court erred in denying its motion for a directed verdict is that plaintiff failed to establish that the puddle, regardless of its composition, was the proximate cause of her fall. With respect to this issue, defendant

argues that plaintiff never testified that she saw the puddle prior to her fall and that the only evidence of what caused her fall is that she found her keys near the puddle which she herself testified was relatively undisturbed.

It is well established that "[l]iability may not be based upon speculation, imagination, or mere conjecture." (*Kalata v. Anheuser-Busch Cos.* (1991), 144 Ill. 2d 425, 437, 581 N.E.2d 656; *Vance v. Lucky Stores, Inc.* (1985), 134 Ill. App. 3d 166, 480 N.E.2d 167.) However, "[w]here there is direct evidence or circumstantial evidence from which reasonable inferences may be made to support each element of the cause of action, then the issue of liability is properly left to the jury." *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d at 437-38, citing *Tiffin v. Great Atlantic & Pacific Tea Co.* (1959), 18 Ill. 2d 48, 162 N.E.2d 406.

■ Here plaintiff has presented sufficient evidence on the issue of proximate cause to avoid a directed verdict. In addition to finding her keys next to the puddle after the fall, plaintiff expressly testified that she slipped in a puddle of oil and fell. Plaintiff's mother testified that although she did not see plaintiff fall, she turned around to see plaintiff lying in a puddle of oil. Even Herrick, defendant's only occurrence witness, testified that he saw plaintiff fall and was able to circle the spot on a photograph. Although Herrick testified that the puddle was composed of water rather than oil, there is no question that even his testimony supports the fact that the puddle, regardless of its composition, was the proximate cause of plaintiff's fall.

Although this case will be remanded, we address two evidentiary issues raised by defendant because they might occur on retrial. First, defendant argues that the trial court abused its discretion in finding Dr. Elizabeth Kessler competent to testify as an expert witness. Second, defendant contends that the trial court erred in excluding excerpts from the evidence deposition of Dr. Robert Stone which indicated that he observed no symptoms of multiple sclerosis when he examined plaintiff after the incident.

With respect to Dr. Kessler, defendant claims that she was not competent to testify as an expert witness because she possesses "only a superficial familiarity with the relevant literature, chooses to ignore the most current findings in this area, and readily admits that she does not know the opinion of the majority of physicians concerning the connection between trauma and multiple sclerosis." We disagree.

The trial court has "broad discretion in determining if a witness has been qualified as an expert." (*Broussard v. Huffman Manufacturing Co.* (1982), 108 Ill. App. 3d 356, 362, 438 N.E.2d 1217.) Here, plaintiff bears the burden of establishing the qualification of her

expert and therefore must show that she possesses the necessary learning, knowledge, skill or practical experience to enable her to testify as an expert. (*Bloomgren v. Fire Insurance Exchange* (1987), 162 Ill. App. 3d 594, 599, 517 N.E.2d 290.) An expert can obtain expertise in an area through study or experience or a combination of both. *Nowakowski v. Hoppe Tire Co.* (1976), 39 Ill. App. 3d 155, 349 N.E.2d 578.

■ The trial court was well within its discretion in allowing Dr. Kessler to testify as an expert on multiple sclerosis. Dr. Kessler testified that she was a board-certified neurologist for 11 years at the time of trial. After three years in neurological residency she joined the faculty at Rush-Presbyterian, where she was an assistant professor in neurology for four years. In addition to this academic experience, Dr. Kessler indicated that she treats patients with multiple sclerosis in the course of her practice. In light of these credentials in the field of neurology and her treatment of multiple sclerosis patients, the trial court was within its discretion to allow Dr. Kessler to testify as an expert. See *Bartsch v. Gordon N. Plumb, Inc.* (1985), 138 Ill. App. 3d 188, 485 N.E.2d 1105 (witness with expertise in the general field of microscopy qualified as an expert in the more specific field of document dating even though his prior experience in the more specific area was "limited"); see also *Dole Valve Co. v. Perfection Bar Equipment, Inc.* (7th Cir. 1969), 419 F.2d 968 (no error occurred when witness who was experienced in the general field of fluid flow was allowed to give expert witness testimony on method of and apparatus for carbonating, storing and dispensing beverages); see also *Valiulis v. Scheffels* (1989), 191 Ill. App. 3d 775, 547 N.E.2d 1289 (expert witness who was not a licensed physician, but a clinical psychologist who was consulted by neurologists in the diagnoses of patients with multiple sclerosis, was qualified to testify on causal connection between trauma and multiple sclerosis).

Defendant's claim that Dr. Kessler possessed only a superficial similarity with the relevant authorities on the topic is also unavailing. "[G]reat liberality is allowed the expert in determining the basis of his opinions" (*Melecosky v. McCarthy Brothers Co.* (1986), 115 Ill. 2d 209, 216, 503 N.E.2d 355), and "[i]t is presumed that the expert because of his special knowledge is able to judge the reliability of the information on which he bases his opinion." (*Montefusco v. Cecon Construction Co.* (1979), 74 Ill. App. 3d 319, 322, 392 N.E.2d 1103.) While defendant's expert questioned the validity of the authorities relied on by Dr. Kessler, we cannot say that reliance on these authorities invalidated Dr. Kessler's opinion, especially in an area such as this one.

The medical research in the area of multiple sclerosis is by no means settled and certain. As displayed by the testimony at trial, there appears to be considerable diversity of opinion in the medical community over whether there is a relationship between head trauma and the aggravation of a preexisting multiple sclerosis condition. (See *National Castings Division of Midland-Ross Corp. v. Industrial Comm'n* (1973), 55 Ill. 2d 198, 204, 302 N.E.2d 330 (stating in the context of multiple sclerosis, "[w]here *** there exists limited medical knowledge of a malady we have recognized that medical testimony pertaining to causation may not be unqualified and unequivocal").) That the Sibley study, the primary study relied on by defendant's expert, is more recent goes to the weight of the experts' opinion rather than to invalidate Dr. Kessler's opinion. Any other determination would in effect rule that the Sibley study controlled as a matter of law. That conclusion is rebutted by defendant's own expert, who conceded that well-respected authorities in the field had concluded that there could be a relationship between the trauma and multiple sclerosis. Thus, we cannot say that Dr. Kessler's opinion should be invalidated because she chose to rely on authoritative sources other than the Sibley study. See *Kane v. Ford Motor Co.* (1984), 17 Ohio App. 3d 111, 477 N.E.2d 662 (physician's expert opinion referring to studies as providing a partial basis of his knowledge of multiple sclerosis and his opinion that plaintiff's injury at work aggravated his preexisting multiple sclerosis condition was admissible).

The second evidentiary issue raised by defendant is the trial court's refusal to allow excerpts from the deposition of Dr. Robert Stone, in which he stated that he observed no symptoms of multiple sclerosis when he examined the plaintiff in May 1983, to be read into evidence. We believe it was error for the trial court to preclude defendant's use of the deposition on the basis of its order *in limine* which limited testimony on the issue of causality to Drs. Kessler and Reder because Dr. Stone's testimony went to his observations as a treating physician rather than on whether the trauma exacerbated plaintiff's existing multiple sclerosis condition. However, that error by itself was harmless and would not require reversal. Dr. Stone's testimony would only serve to bolster defendant's position, which was already before the jury in the form of Dr. Reder's testimony that he had reviewed post-accident medical records including those of Dr. Stone and that there were no symptoms of multiple sclerosis at the time of Dr. Stone's examination. Consequently, the exclusion of the deposition does not warrant a new trial. See *Perez v. Hartmann* (1989), 187 Ill. App. 3d 1098, 543 N.E.2d 1023 (upholding trial court's

278

exclusion of testimony of nurses that plaintiff died during "Code Blue" when plaintiff's expert and defendant both testified to that same fact because the excluded testimony was cumulative).

In light of our decision, we need not address the defendant's contention that the jury's verdict is irreconcilably inconsistent. There is no reason to expect that the next jury to hear this case will create the same question.

For the foregoing reasons, we reverse the judgment entered by the trial court and remand this case for a new trial.

Judgment reversed and remanded.

MURRAY and McNULTY, JJ., concur.